UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| **LYNEESHA JACKSON** | **CIVIL ACTION NO. 07-0351** |
| **VS.** | **JUDGE MELANÇON** |
| **Commissioner<br>Social Security Administration** | **MAGISTRATE JUDGE METHVIN** |

### REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be **REVERSED**.

*Background*

Born on January 7, 1987, Jackson is currently 21 years old. Jackson left school in the ninth grade due to disciplinary problems.[1] She has no past relevant work history.[2] On August 4, 2004, Jackson protectively filed an application for supplemental security benefits, alleging disability since July 31, 1997 due to intellectual and behavioral difficulties.[3] Jackson's application was denied initially and, pursuant to her request, an administrative hearing on September 18, 2006.[4] Because Jackson turned 18 years old on January 17, 2005, the ALJ considered her eligibility for benefits under both the child's standards and the adult standards.

---

[1] Tr. 136.

[2] Tr. 143.

[3] Tr. 13, 42.

[4] Tr. 13, 25-29, 132-149.

The ALJ denied benefits on September 28, 2006.[5] On January 23, 2007, the Appeals Council denied review and Jackson timely filed this appeal.

### *Assignment of Errors*

Jackson alleges the following errors: 1) the ALJ erred in disregarding the testimony of the consulting psychologist and the vocational expert; 2) the ALJ erred in finding that she had the ability to perform work on a regular and continuing basis; 3) the ALJ failed to consider all of the evidence; 4) the ALJ's decision was not based on substantial evidence; and 5) the ALJ's hypothetical to the VE was not based on the evidence.[6]

### *Standard of Review and Procedures for Analysis of Impairments*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).[7]

---

[5] Tr. 13-20.

[6] Jackson's objections concern the ALJ's conclusion that she can perform work on a sustained basis. Jackson has not objected to the ALJ's findings that her impairments do not meet a listing nor are the functional limitations caused by her impairments disabling. Accordingly, the undersigned will not address these findings.

[7] Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson v. Bowen , 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

As stated above, because Jackson turned eighteen during the pendency of her case, the ALJ evaluated whether Jackson was entitled to benefits under both child and adult disability standards.

### *Childhood SSI Benefits*

An individual under age 18 may be found disabled "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §1382c(a)(3)(C)(i). The regulations provide a three-step sequential evaluation process for determining whether a child's impairments result in "marked and severe limitations."[8]

The ALJ concluded that Jackson suffers from the following severe impairments: borderline intellectual functioning, post-traumatic stress disorder, and a personality disorder. The ALJ further found that these impairments did not meet or functionally equal the requirements of a Listed impairments.[9] The ALJ further determined that Jackson's impairments did not functionally equal a listed impairment under the childhood disability regulations.[10]

---

[8] First, if the child is engaging in "substantial gainful activity," the child will be found not disabled regardless of medical condition or age, education, or work experience. 20 C.F.R. §416.924(b). Second, the child must have a severe impairment or impairments. If the child suffers from a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations, the child will be considered to have no severe impairment, and therefore to be not disabled. Title 20 C.F.R. §416.924(c). Third, the child will be considered disabled if his or her impairment(s) meet, medically equal, or functionally equal in severity a listed impairment in Appendix 1 of Subpart P of Part 404 of the chapter. If a child's impairments do not meet or medically equal a listed impairment, the Commissioner will assess all functional limitations caused by the child's impairments to determine whether the functional limitations are disabling. 20 C.F.R. §§ 416.926a (functional equivalence for children). *See*, *e.g.*, Luckerson v. Apfel, 2000 WL 1222125 (N.D. Ill. Aug. 22, 2000).

[9] Tr. 16.

[10] Tr. 18-19.

*Adult SSI Benefits*

In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992).[11]

When a mental disability claim is made, such as borderline intellectual functioning, post-traumatic stress disorder, and a personality disorder, the Commissioner utilizes a corollary sequential procedure for determining the merits of the claim. Essentially, this procedure substitutes specialized rules at Step 2 for determining whether a mental impairment is severe, and also provides detailed guidelines for making the Step 3 determination as to whether the mental impairment meets or exceeds the Listings. The Regulations require:

> [T]he ALJ to identify specifically the claimant's mental impairments, rate the degree of functional limitation resulting from each in four broad functional areas, and determine the severity of each impairment. Furthermore, § 404.1520a(e)

---

[11] The procedure is as follows:

1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2. A person who does not have a "severe impairment" will not be found to be disabled.

3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4. If a person can still perform his past work, he is not disabled.
5. If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

provides that the ALJ must document his application of this technique to the claimant's mental impairments.

Satterwhite v. Barnhart, 44 Fed. Appx. 652 (5th Cir. 2002) (unpublished).[12]

As noted above, the ALJ determined that Jackson's borderline intellectual functioning, post-traumatic stress disorder, and a personality disorder are severe.[13] Relying on the testimony of a vocational expert, the ALJ found that there were jobs existing in significant numbers which Jackson can perform, and therefore she is not disabled.[14]

*Administrative Record*

*Relevant Medical History*

### *St. Mary Medical Health Center*

Jackson has a lengthy history of mental health difficulties. Her treatment began in 1998, when she was eleven years old, at the St. Mary Mental Health Center. Staff psychiatrist, Minati Biswas, M.D., states that Jackson had been referred by the Louisiana Office of Community Services because she had been molested by her biological father for three years, from the age of six to nine.[15] Dr. Biswas diagnosed post-traumatic stress syndrome and prescribed Prozac, Depokote,[16] and supportive counseling. Jackson was subsequently diagnosed

---

[12] For a succinct summary of the current law, see Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004).

[13] Tr. 16.

[14] Tr. 19-20.

[15] Tr. 85.

[16] Depakote is used for the treatment of bi-polar disorder. http://www.depakoteer.com/depakoteer/

with ODD and ADHD. On April 16, 1999, her medications were Zyprexa,[17] Buspar,[18] Ritalin, and Depakote.

Jackson was not seen again at the St. Mary Health Clinic until December, 2000.[19] Jackson informed the Clinic personnel that she had been court-ordered to return there, having been arrested for damage to property, battery on an officer, resisting arrest and curfew violation. Jackson said she had been in a group home from November, 1999 until February, 2000 when she ran away. She was sent to a juvenile detention facility for six months, was released, and then placed in the St. James Youth Center in October, 2000 for five days. At that time she was diagnosed with adjustment disorder with mixed anxiety and depressed mood and started on Paxil.[20]

The next month, in January, 2001, she informed the staff at the Center that she had made a suicide attempt by overdosing on her Paxil.[21] She was seen intermittently at the Center during 2001 and 2002. She was last seen there on August 20, 2002 when her diagnosis was impulse control disorder.[22]

---

[17] Zyprexa is used for the treatment of bi-polar disorder and schizophrenia. http://zyprexa.com/about_zyprexa.jsp?WT.mc_id=ZypCSBip0001&WT.srch=1

[18] Buspar is used to treat anxiety. http://www.buspar.com/

[19] Tr. 79.

[20] Id. It appears that Jackson may have possibly had other suicide behavior/attempts. Progress notes from the Teche Action Center on August 8, 1997 indicate, "pt triaged . . . not suicidal, homicidal or gravely impaired." Tr. 87. The protective filing worksheet notes, "mother gets SSI; bad temper, suicide attempts." Tr. 42.

[21] Tr. 78.

[22] Tr. 68.

**Dr. Alfred E. Buxton, Ph.D.**

On November 10, 2004, the Disability Determination Services referred Jackson to Dr. Buxton for a psychological evaluation.[23] Jackson related to him her history of father-daughter incest from age 5 to 11 years, and her history of treatment. She also related her history of being placed in group homes, Louisiana Training Institute, and juvenile detention homes. Jackson reported to him that she was expelled in the 2003-2004 academic year at the 9th grade level. She was not doing well academically. Jackson does not have a driver's license.

She reported being in trouble with the law "too many times to name." She had an upcoming hearing for aggravated battery and aggravated assault. She felt that her mental health was "bad," and her sleep was restless.

On examination, Dr. Buxton concluded that ability to attend and concentrate was good; persistence was good; pace was even with a regular rate of performance, and a normal response latency. He found, "[i]mpulse control is one with a history of poor self-management."[24] He felt that her intellect was sub-average; her judgment and reflective cognition was good; reasoning was fair and insight was poor. Dr. Buxton noted her history of low tolerance for frustration, poor stress-coping skills; and a tendency to lash out with impulsive aggressiveness. He felt that his findings were a reliable and valid estimate of her current functional status.

---

[23] Tr. 16-119.

[24] Tr. 117.

Dr. Buxton concluded: Jackson is of borderline sub-average general intellect with adaptive living skills ranging from borderline to average and day-to-day functioning most closely approximating dull normal or low average adaptive daily living skill development. Level of competency was sub-average but within acceptable limits of general expectancy.

Dr. Buxton diagnosed Jackson with Post-Traumatic Stress Disorder and Intermittent Explosive Disorder. He concluded that "perhaps more significantly and creating problems for her in her social environment is a Personality Disorder, Not Otherwise Specified with narcissistic, borderline, and antisocial features."[25]

### *Administrative Hearing*

#### *Jackson's Testimony*

At the administrative hearing, Jackson testified that she has a hard time getting along with other people and being around them.[26] Jackson lives with her mother; she maintains no social contact with other people and spends all of her time in her house.[27] She sleeps all day in her room, and tries to keep away from other people because she knows the problems she has with her temper.[28] She is always mad and angry for no reason.[29]

---

[25] Tr. 118.

[26] Tr. 137.

[27] Tr. 138.

[28] Id.

[29] Id.

Jackson testified that she did not keep up with her regular treatment at St. Mary Mental Health Clinic because she has no transportation, and "they took [her] off the medical card."[30] The Clinic is 25 or 30 miles from where she lives; she does not own a car and has no driver's license.[31]

Jackson testified that she has tried to work in the past at a store doing cash register work but did not last "even a month."[32] She explained that she couldn't get along with other people and didn't catch on as fast as she should.[33]

Jackson also testified that she has sleep apnea and has a machine to help her.[34] She has a hard time staying awake during the day and sleeps all day and most of the night with the machine.[35]

Jackson testified that she could not hold down a job because, "I have bad nerves and I can't keep still. I don't catch on as fast as they want me to. And I just, you know, around other people."[36]

---

[30] Tr. 139.

[31] Id.

[32] Tr. 140.

[33] Id.

[34] Tr. 141.

[35] Tr. 141-142.

[36] Tr. 142.

*Vocational Expert's Testimony*

During the hearing, Edward Ryan, a vocational expert, was called to testify. He testified that given Jackson's RFC as identified by the ALJ, Jackson could work as a janitor, in food preparation and service, and as a dishwasher or kitchen helper.[37]

## Findings and Conclusions

*Substantial Evidence*

Jackson maintains that substantial evidence does not support the ALJ's conclusion that she can perform sustained gainful employment. Jackson contends, among other things, that the ALJ rejected vocationally relevant opinions of Dr. Buxton without explanation and "picked and chose" only the evidence that supported his opinion. The undersigned agrees.

The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity. Perez v. Heckler, 777 F.2d 298, 302 (5th Cir. 1985). "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Martinez v. Chater, 64 F.3d 172, 175-176 (5th Cir. 1995), quoting, Moore v. Sullivan, 919 F.2d 901, 905 (5th cir. 1990). However, ". . . the ALJ must consider all the record evidence and cannot "pick and choose" only the evidence that supports his position. Loza v. Apfel, 219 F.3d 378, 393 (5th Cir. 2000).

The ALJ determined that Jackson had the residual functional capacity to perform work at all exertional levels with routine repetitive tasks, working with things rather than in groups of

---

[37] Tr. 143-144.

people, low stress, and no high paced work activity.[38] He found that Jackson can sustain employment:

> The vocational expert also testified that a person could not sustain work if they missed more than two days per month on a repetitive basis or was away from the work station repetitively on unscheduled breaks. The Administrative Law Judge notes that there is nothing in evidence suggesting that claimant would need to miss work or take unscheduled breaks.[39]

A review of the record shows that the ALJ's findings and conclusions are not supported by substantial evidence. Jackson has been treated since she was eleven years old for post-traumatic stress syndrome, adjustment disorder with mixed anxiety and depressed mood, and impulse control disorder, due, at least in part, to early childhood sexual abuse. She has been arrested on several occasions for aggressive behavior. Jackson testified she cannot hold a job because of her inability to "catch on" and her emotional problems. She isolates herself because of her inability to control her temper.

The ALJ concluded that Jackson's testimony that she cannot work was not credible; however, he fails to explain his reason for rejecting Dr. Buxton's opinions, which included the following:

> Certainly she is bright enough that she could understand simple instructions and command and a good bit of complex instruction and command. The problem is that she would perform inconsistently over time and prove to be rather unreliable and undependable and this being secondary to the nature of her

---

[38] Tr. 19.

[39] Tr. 20.

characterlogical defects. She would not deal well with the frustration and stress she would encounter in the job setting and would respond in an impulsive fashion that would lead to her own demise. She would have difficulty establishing much less maintaining even minimally adequate interpersonal relationships with coworkers and supervisors alike secondary to the negative impacts of her characterlogical defects and impulsive nature of those relationships.[40]

The overwhelming evidence of record shows that Jackson's impairments are chronic and severe. There are no reports from any examining physician that contradict or dispute Dr. Buxton's opinions. In order to be capable of engaging in substantial gainful activity, a person must have a realistic chance of both obtaining as well as holding a job in a *realistic* work setting:

> In [Wingo v. Bowen, 852 F.2d 827 (5th Cir.1988)], this Court held that a determination that a person is capable of engaging in substantial gainful activity depends on a finding not only that the individual has some chance of being hired, but also, that, taking account of the individual's exertional and non-exertional limitations, the individual has a reasonable chance, "once hired, of keeping the job." *Id.* at 831. We noted that "[a] claimant capable of performing sedentary or light work under the guidelines must have the ability to perform the required physical acts day in and day out in the sometimes competitive and stressful conditions in which all people work in the real world." *Id.* (*citing* Allred v. Heckler, 729 F.2d 529, 533 (8th Cir.1984)).

Watson v. Barnhart, 288 F.3d 212 (5th Cir. 2002).

The government argues that the ALJ incorporated Dr. Buxton's opinion into the RFC by reducing the opinion to functional restrictions such as working with routine repetitive tasks, things rather than in groups of people, low stress, and no high paced work activity. However, the ALJ's hypothetical question failed to adequately reflect Dr. Buxton's opinions about Jackson's ability to perform work reliably day in and day out. Counsel for Jackson questioned the VE

---

[40] Tr. 118-119.

regarding the ability of an individual to sustain employment of Jackson's age and vocational and incorporating Dr. Buxton's opinions regarding Jackson's unreliability, lack of dependability, and impulsive responses to stress and when relating to her co-workers and supervisors. The VE testified that such a person could not sustain employment in the competitive labor market.[41]

Considering the foregoing, the undersigned finds that the ALJ's determination that Jackson could perform work on a sustained basis is not supported by substantial evidence.

*Conclusion*

The undersigned finds that substantial evidence of record supports the ALJ's decision. Accordingly, it is **RECOMMENDED** that the Commissioner's decision be **REVERSED** and that Jackson be awarded benefits consistent with an onset date of January 17, 2005.[42]

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10)**

---

[41] Tr. 149.

[42] A judgment entered adopting this Report and Recommendation constitutes a "final judgment" that triggers the filing period for an EAJA fee application. Shalala v. Schaeffer, 509 U.S. 292, 113 S.Ct. 2625, 2631 (1993); Freeman v. Shalala, 2 F.3d 552 (5th Cir. 1993).

**days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir.  1996).**

Signed at Lafayette, Louisiana, on July 30, 2008.

*[Signature]*

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)